**The PENN CENTRAL CORPORATION, and Penndiana Improvement Corporation, Plaintiffs,**

v.

**UNITED STATES RAILWAY ASSOCIATION, and Consolidated Rail Corporation, Defendants.**

**No. 77–4.**

Special Court
Regional Rail Reorganization Act of 1973.

July 19, 1979.

Paul R. Duke and J. Michael Hemmer, Washington, D. C., for plaintiffs The Penn Central Corporation and Penndiana Improvement Corporation.

John G. Harkins, Jr., Laurence Z. Shiekman and Teresa R. Novick, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant Consolidated Rail Corporation.

G. Joseph King and David Manning, Washington, D. C. (Cary W. Dickieson, Gen. Counsel, Stephen C. Rogers, Deputy Gen. Counsel, Washington, D. C., United States Railway Association, of counsel) for defendant United States Railway Association.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

In this action, of which we have jurisdiction under § 209 of the Rail Act, 45 U.S.C. § 719, the Trustees of the property of Penn Central Transportation Company, for which The Penn Central Corporation (PC) has now been substituted, and PC's wholly owned subsidiary, Penndiana Improvement Corporation (Penndiana) challenge the legality of the conveyance to Consolidated Rail Corporation (ConRail) of an office building and adjoining parking lot (the Building), at 31 East Georgia St., Indianapolis, Indiana. The parties have engaged in extensive discovery, have entered into a stipulation of facts, and have agreed that the case be taken on submission.

Prior to April 1, 1976, the conveyance date, the Building was owned by Penndiana. A large part of it was used as PC's regional headquarters for its Southern Region. PC had leased 42% of the space from Penndiana; it occupied another 11% under an informal arrangement. The tracks of the former Indianapolis Union Railroad are directly south of the Building and were conveyed to ConRail.

The Rail Act as originally adopted, 87 Stat. 985 (1974), provided in § 206(c)(1) only for the designation for conveyance to ConRail of "rail properties of railroads in reorganization in the region or of railroads leased, operated, or controlled by any railroad in reorganization in the region," and § 102(10) defined "rail properties" to mean "assets or rights owned, leased or otherwise controlled by a railroad which are used or useful in rail transportation service." Despite this limited wording, the United States Railway Association (USRA) took the position that it was authorized to designate property of controlled nonrail subsidiaries which was an integral part of the parent's rail operations. 1 FSP 229–30. Whether or not this was correct became moot when the Act was amended to define "rail properties", in what is now § 102(12),

as including "assets or rights owned, leased, or otherwise controlled by a railroad (or a person owned, leased, or otherwise controlled by a railroad) which are used or useful in rail transportation service." Pub.L. No. 94–210, 90 Stat. 31 (1976).

The FSP had announced that office buildings like all other structures along transferred rail lines which are used or useful in transportation service would be transferred if "firm, credible plans for ultimate use of the structure for rail-related purposes are made before the expiration of 60 days after the FSP's effective date." 1 FSP 246. Penndiana, however, was specifically listed as one of "the principal real estate companies and other non-rail enterprises owned by each of the railroads in reorganization" whose properties would not be conveyed, 1 FSP 230 n. 26. On the other hand, PC's leasehold in the Building was designated for transfer to ConRail, 1 FSP 264. The reason the Building itself was not designated was apparently because of some confusion at the time over who owned the fee interest. USRA was not aware when drawing up the FSP that Penndiana was the owner. If it had been so aware, Penndiana would doubtless not have been listed in footnote 26.

On December 1, 1975, USRA filed with Congress its Official Errata Supplement to Volumes I and II of the FSP. It stated, p. 1:

> In converting the rail lines designations to more precise property descriptions as part of the conveyance process, the Association has discovered a few instances in which properties designated as owned by one of the bankrupt estates may actually be owned by a nonbankrupt subsidiary. For example, in a few instances, rail facilities or underlying land thought to be owned by Penn Central (or one of its leased lines) may be owned by Manor Real Estate Company, and land apparently owned by CNJ and used and useful in rail operations may be owned by its subsidiary, Communipaw Central Land Company. Other such instances may be discovered before the conveyance process is

completed. For the reasons set forth at pages 229–30 of the FSP, the Association believes that rail properties owned by such controlled subsidiaries are rail properties of a railroad in reorganization and subject to designation. Corrected designations covering these situations will be included in the Association's certification to the Special Court, with the result that some properties may be certified for transfer from entities which are identified in Chapter 8 of the FSP (page 230 and notes 22–26) as entities from which no properties are designated. This general corrective designation applies to all entities with interests in rail properties, specific designations in Chapter 8 and the Appendix to the contrary notwithstanding.

Section 208(d) of the Act provides, *inter alia*, that the Official Errata Supplement, "including all designations made therein, shall be treated for all purposes as if they had been part of and included in the final system plan adopted by the Association and reviewed by the Congress."

During the fall of 1975 USRA and the various transferors engaged in lengthy discussions about the conveyances—discussions rendered difficult by the vast amount of property to be transferred and the inadequacies of the records. USRA made known that it intended to draw the conveyance documents broadly to encompass all property owned by a transferor in a particular county "lying in, under, above, along, contiguous to, adjacent to or connecting to" any conveyed line of railroad—language plainly broad enough to include the Building. Transferors were requested to identify and describe properties they would retain under this interpretation of the FSP. On receipt of a request for an exception to the broad language, USRA field inspectors made a recommendation whether the property was used or useful in rail transportation service. In cases of disagreement a hearing would be held at which Douglas L. Siegel, Assistant General Counsel for USRA, would make a decision.

Consistent with this procedure and the policy announced in the Errata Supplement, USRA prepared three real property identifications for Penndiana, the one here relevant being for property in Marion County, Indiana. Provision was made for excluding property described in an "Exhibit B". No exception for the Building was requested. The Errata Supplement, p. 13, continued to include PC's leasehold interest in the Building. The deed of its property in Marion County which Penndiana executed to Con-Rail was in the broadest terms; Exhibit B excepted two parcels, neither being the Building. PC also executed an assignment of its lease from Penndiana.

The parties did not become immediately aware of the effect of the conveyance of the Building. ConRail paid rent to Penndiana for the space it had leased, as did two subsidiaries for space occupied by them. Penndiana acted as owner of the Building and paid taxes and management expenses. It also collected rentals due from third parties. In November 1976 ConRail advised Penndiana that it owned the Building and ceased paying rent for leased property or charges for occupation of other property.

■ Conceding that the deed executed by the Trustees conveyed title to the Building, PC argues that the conveyance should not be given its literal effect. We do not see why. The Building clearly came within the Act, perhaps under the initial USRA position in 1 FSP 229–30, indisputably under the amended Act's definition of "rail properties". PC does not claim invalidity in USRA's rule of thumb that a building more than 50% of which was devoted to rail service was "used or useful in rail transportation service," and we perceive no basis for doing so.

■ PC's main argument is that the situation here at issue does not fall within the first sentence of the extract from p. 1 of the Errata Supplement which we have quoted, and that therefore the Errata Supplement did not amend the original exclusion of Penndiana properties. The extract clearly informed Congress "that some properties may be certified for transfer from entities which are identified in Chapter 8 of the FSP (page 230 and notes 22–26) as entities from which no properties are designated," and that "[t]his general corrective designation applies to all interests in real properties, specific designations in Chapter 8 and the Appendix to the contrary notwithstanding." The situation in the present case, a nonrail subsidiary discovered to own a building used for rail purposes which had not previously been known to be one of its assets, is quite similar to the situation covered by the first sentence of the Errata Supplement extract. We therefore see no reason not to read the general language of the Errata Supplement as covering this case.

■ PC argues further that since USRA designated what had been PC's leasehold, it could not have meant to designate the fee even if this had become legally permissible. We see no force in this. PC concedes that the initial designation of the leasehold in the FSP was required since otherwise PC could have retained the space as lessee. This remained true after the fee itself was designated, although as a result of the two designations ConRail's status as tenant merged with its rights as owner.

■ Finally PC argues that ConRail should be estopped from claiming a fee interest in the Building. The contention appears to be that the designation of the leasehold for conveyance to ConRail misled Penndiana into thinking that this was all that USRA desired for ConRail and that otherwise Penndiana would have asked for exclusion of the Building. The argument is flawed. Mr. Siegel specifically called a senior representative of Penn Central "to remind him that we had had this change in the errata [with respect to Penndiana] and to make sure that any parcel that was to be excluded, any piece of real estate owned by a real estate subsidiary adjacent to a rail right of way, they had better carefully re-

view and make sure they had requested it in connection with the conveyance process." In fact Penndiana obtained such an exclusion with respect to another property in Marion County. Finally, in light of its more than 50% rule, USRA would not have granted a request for an exception for the Building if one had been sought.

The parties have stipulated in paragraph 9 of the pretrial order as to the financial adjustments to be made if this Court determines that ConRail was conveyed both PC's leasehold and Penndiana's fee interest in the Building. We do so determine.

The complaint is dismissed.